Good morning, and may it please the court. Aaron Street on behalf of the appellant, Kirk Dimitrick. The contempt order should be reversed in its entirety. Mr. Dimitrick did not violate an unambiguous command in the preliminary injunction because he did not take the initial step to contact a Ravago employee. Judge Hughes didn't apply that crucial initial step limitation at all because he mistakenly thought that any discussion of employment with Vinmar was prohibited under Paragraph 4. But under a proper interpretation of Paragraph 4, the undisputed facts of this record reveal that Mr. Dimitrick did not take the initial step to contact a Ravago employee. Now the first and most direct route to reversal is to consider the encounter between Mr. Diaz and Mr. Lacayo. That's because the Diaz encounter leads to reversal even if you accept Ravago's interpretation of Paragraph 4. Recall that Ravago interprets Paragraph 4 to prohibit Mr. Dimitrick from taking the initial step to communicate about Vinmar employment. But Mr. Diaz testified without rebuttal that he was the first to raise the prospect of Vinmar employment with Mr. Ravago. And that testimony was not disputed. Mr. Lacayo in fact admitted that he had a conversation with Mr. Diaz, but he claimed that he couldn't recall the contents of that conversation. So even under Ravago's interpretation, Mr. Dimitrick was not the first one to raise the prospect of Vinmar employment with Mr. Lacayo. So under the Diaz encounter, this court can reverse without having to even wade into the proper interpretation of Paragraph 4. Now, Ravago's entire responsive arguments as to Mr. Diaz are contained in two paragraphs in its appellee's brief on pages 26 through 27. Its principal argument is that Judge Hughes could have disregarded Diaz's unrebutted testimony that he was the first to raise Vinmar employment with Mr. Lacayo. And to be sure, Judge Hughes could have made a credibility finding on that point like he did with other witnesses. He could have disregarded Mr. Diaz's testimony if there was some controverting evidence on the other side that he could have chosen to credit. But what Judge Hughes did instead is disregard Diaz's testimony because he thought it was with Ravago employees. And this court's case law is very clear that a plaintiff with the burden of proof cannot carry its burden or create a fact issue simply by asking the court to disregard unrebutted testimony that's unfavorable to it. And in fact, this court in Mutual Life Insurance v. Sargent back in 1931 said that that principle especially applies when you have testimony about a simple fact that could have been easily rebutted if untrue. That's exactly what you have here. Mr. Diaz testified that he raised employment. Mr. Lacayo could have rebutted that if it were untrue, but he didn't do so. Now, this is especially clear when Ravago carries the burden to prove contempt by clear and convincing evidence. And in fact, the situation is very similar to what happened in the Travel Host Contempt case that the parties cite, although not on this specific point. And if the court looks at page 695 of the Travel Host Contempt case, in that case the defendant produced unrebutted testimony showing that he did not violate the order. This case was multiple defendants. The movement argued, quote, the district court was free to disbelieve or discredit this testimony. End quote. This court responded, quote, disbelief of a witness's testimony is not sufficient to carry the plaintiff's burden or support the district court's finding to the contrary. The plaintiff must still prove the violation through clear and convincing evidence. End quote. So that's the situation that we have here. We have unrebutted testimony that exonerates Mr. Dimitri from violating the preliminary injunction, and all we have on the other side is a bare plea to disregard unrebutted evidence. So on that ground alone, the court should reverse. Now, Ravago has a second argument regarding the Diaz testimony. That argument is that Mr. Dimitri still violated the preliminary injunction because it was another VINMAR employee that raised the prospect of employment with Mr. Licayo. But that runs directly into the language of the preliminary injunction itself, which is at page 415 in the record. And there on that page, the preliminary injunction expressly applies only to Mr. Dimitri or parties acting in active concert or participation with him. There's no allegation. In fact, there's a concession to the contrary that Mr. Dimitri and Mr. Diaz were working together here. They, in fact, had no idea that the other was having the conversation. So because someone that was bound by the preliminary injunction did not make the initial contact to discuss employment, Mr. Dimitri was free to have those employment discussions with the Ravago employee. So again, just looking at the Diaz encounter, this court can reverse without having to wade into the interpretation of paragraph 4 because Mr. Dimitri didn't violate even Ravago's reading of paragraph 4. Now, there's a second reason that the court should reverse, and that is that Dimitri did not violate paragraph 4 because the initial step occurred when Lacayo ran into Dimitri at the trade show, even before the Diaz conversation. And remember, paragraph 4 does not prohibit Dimitri from discussing employment with Ravago employees. The Connecticut District Court considered that, and it imposed a much narrower limitation. And instead, the District Court in Connecticut applied the limitation only when Dimitri, as opposed to some other person, took, quote, took the initial step to contact the Ravago employee. So at a bare minimum, this language, taking the initial step to contact, did not unambiguously prohibit Dimitri from discussing employment after a Ravago employee runs into him at a trade show. It's at the bare minimum ambiguous that Mr. Dimitri could have continued to have an employment discussion. And remember that that's the principle that applies in construing court orders in contempt cases. As this court said in the Testmaster's case, an order that vaguely or ambiguously requires the party to perform or abstain from certain conduct does not qualify for contempt. Now, of course, Ravago has a different reading of paragraph 4. We've already touched on that. Ravago's reading is that Dimitri is prohibited from taking the initial step to communicate about Denmark employment. But that interpretation has problems. The first is that it's relying on what is called the series qualifier canon to read the phrase to work for Denmark to apply back to the phrase initial step to contact. But as we point out in our brief, the default interpretive rule that applies when you have a series followed by a qualifier is that the qualifier only applies to the last antecedent. It doesn't apply all the way back to the beginning of the list. That's the default rule. And that default rule should apply here because Ravago's reading renders certain terms superfluous. Ravago would read the term contact, initial step to contact, to mean initial step to communicate about Denmark employment. But that would make contact mean exactly the same thing as initial step to solicit. That's contrary to the plain language of the preliminary injunction. The preliminary injunction recognizes that there will be contacts that are not themselves solicitation. And so long as it's someone else who makes that type of contact, then Mr. Dimitri is free to discuss employment with Denmark. Mr. Street, make sure I understand where that argument takes us. If we leave initial step only with the word contact, that's your position, correct? That it modifies only contact? This injunction would prohibit Dimitri from contacting any current employees of Ravago. Why would the injunction be that broad? Contact them to see what they're doing that summer. Contact them to see if they go out to supper.  Why would that be an injunction? Well, it's not any contact. It's from taking the initial step to contact. So it has to be some volitional step. So you decide you want to go out to dinner with an old friend at the company. You make an initial step to contact. That's a violation of the injunction? I agree that that is a very broad term. But by the same token, it's a very broad term with respect to if somebody else takes that type of initial step. And I think it's helpful in this context. It's not so broad, Mr. Street, if you limit it by employment with Venmark. I understand that, Your Honor. But my argument to you is that when an initial step provision is placed into a solicitation provision, that that is a very broad limitation. It's a very broad provision. And we talk about the Harnett case from the First Circuit, where the court says the initial step does not have to correspond to solicitation. It could be an initial step just to see how someone is doing. But that same broad application to Mr. Dmitrich, by the same token, everything that that hand takes away from Mr. Dmitrich is narrowed as well. Because if someone else takes that type of initial step, then Mr. Dmitrich is free to discuss employment with that person. But maybe if I explain a bit more about how we view that provision, it might help answer your question a little bit further. We understand that provision in paragraph 4 to identify a class of conduct, contacting, trying to contact, or soliciting. If Mr. Dmitrich takes the initial step in that class of conduct, then he's violated the preliminary injunction. But by the same token, if someone else makes the first move in that class of conduct, then Mr. Dmitrich is free to discuss employment with VINMAR. And that's what you had here. You had Lacayo running into Dmitrich at the trade show. He says by happenstance. You had Diaz raising employment with VINMAR. And only later do you have Dmitrich allegedly discussing VINMAR employment. So you have two things happening in that class of conduct before Dmitrich even gets to it. But another answer, I think, to your question, Judge Southlick, and a very important answer, is that at a bare minimum, this is ambiguous. Think about it from Mr. Dmitrich's perspective. Someone, not from the perspective of what is he able to do in making an affirmative outreach, which was what your question was, but think about it in terms of Mr. Dmitrich being contacted by someone or run into by someone from Rivago. He has to determine under Rivago's interpretation, well, is that a contact intended to discuss employment with me, in which case I can then go ahead and bring up employment, or is that just an innocuous conduct? Is that just an innocuous contact, and I need to stay clear? So the lines Rivago are drawing are very blurry. They're based on the intent of a third party, and they don't give clear notice of the prohibited conduct to Mr. Dmitrich. Let me ask you this. Go ahead. I'll just finish up this one sentence. We can't count on litigants to consult Scalia and Garner and the various canons of construction before they decide what their conduct is. Under the principles of contempt, we give that benefit of the doubt to the alleged contemporary. I have a question. So we have sort of a mixture of law and fact. My question is the language of the injunction forbade your client from taking the initial step. I understand what your argument is about that, that he didn't take the initial step. So this guy LaCaio testified that your client did. As I understand it, other witnesses testified to the contrary. So my question is, is that a fact issue that Judge Hughes was entitled to make the credibility findings in that in turn inform the legal determination of a violation? Do you follow me? I do follow you, Judge Stewart, and I think it's important to establish the order of battle, which is what you're getting at. First, the court has to construe what Paragraph 4 means. We argue Paragraph 4 means if someone else makes the initial step to contact LaCaio, or someone else makes the initial step to contact the Venmar employee, the Rivago employee, then Mr. Dimitric is free to have those employment discussions. Rivago has another interpretation. So that's the first thing the court has to do. The court has to determine whether we're right, Rivago's right, or it's ambiguous. If we're right or it's ambiguous, then we win. Then, of course, Judge Hughes gets to determine the facts. But the key facts that cause us to prevail are undisputed under our reading of Paragraph 4. Mr. LaCaio says he just bumped into Mr. Dimitric. Under our reading of Paragraph 4, that's the initial contact. But even more clearly than that, Mr. Diaz testifies unrebutted that he's the first one to bring up employment with Venmar, not Mr. Dimitric. So those facts are undisputed on the record. The factual findings that Judge Hughes made is what happened at the end of the day after the trade show when they're having drinks or dinner. And, of course, we're bound to accept those. But that doesn't get you anywhere unless you first reject our interpretation of Paragraph 4. Or you find that it's – and really you have to find that it's unambiguous in Rivago's favor for that to have any potential relevance. And as I pointed out earlier – Okay. Well, that's responsive to my question. I wanted to drill down on that because I want to be clear what Mr. Drabble is going to say about that. So you've got a red light, but thank you for clarifying that. But you've reserved your rebuttal time to come back. So let's hear what Mr. Drabble has to say. May it please the Court. My name is Bill Drabble, and I represent the affilee Rivago Americas LLC. This case is ultimately about order. The contempt power is essential for the district courts to police the litigation and ensure that their injunctions are treated as something more than mere suggestions. The district courts must have the flexibility to vindicate their authority and impose rational remedies when they determine that a party has violated the injunction. This case is also about order in a second sense, making sure that contempt proceedings are conducted in an orderly fashion, including timely assertion of any objections to perceived error. Contempt proceedings should not be a dry run in which a party sits idly by, fails to raise pertinent issues, waits to see if he gets a favorable result, and if not, seek appellate relief as an afterthought. This court should affirm the district court's contempt order for three reasons. First, the district court's finding that Dmitryk violated the preliminary injunction as reasonably interpreted is not clearly erroneous. Second, the district court did not commit plain error because it did not provide Dmitryk with additional criminal procedural protections that he never requested. And third, that the end of the three-month extension of the temporary injunction, along with the termination of the record-keeping requirement, has rendered any complaints about the modification of the injunction moot. And I'd like to start where Mr. Streep was discussing what is the reasonable interpretation of the injunction. And that's what this court's task is to do, is to give the injunction a reasonable or fair interpretation, not a hyper-literal or strict one. The mere fact that Dmitryk offers an alternative interpretation does not mean that he prevails. That's not the way this court interprets injunctions or really any other legal document. The court does not resort to the canon and rule of lenity just because a criminal defendant offers an alternative interpretation of a statute and muster some canon of construction in his favor. Nor does the court find contracts ambiguous. Mr. Drebel, to make sure I understand your argument, are you saying that Dmitryk's counsel in Connecticut, to some extent, waived the right to make these challenges? When is this issue, should this issue first have been raised and it wasn't done, so now we're, I mean, you're complaining about sort of after-the-fact objections. So when should some sort of objection to this have been made that you are talking about? There are three points at which Dmitryk's counsel should have objected. They all occurred in the Southern District. But to go back, we have to start with the filing of Rivago's motion for a show-cause order and for contempt, because in that motion, Rivago expressly requested both civil and criminal sanctions, so Dmitryk knew the potential range of sanctions that he faced. So let me stop you there. Just to make sure that's what you're talking about. So you're not talking about the actual drafting of this up in Connecticut and that Dmitryk should have sought better clarity up there if he thinks it's unclear. That's not part of your argument? I thought that's what I was hearing. No, Your Honor. My argument regarding waiver goes to the argument that Dmitryk has made regarding the criminal procedural protections he alleges he was entitled to. And he should have objected to the lack of procedural protections when the hearing on the motion for show-cause and for contempt was set. Well, let me ask you about that. I mean, I was trying to wait until you did them in order, but if it's criminal, you know, it's criminal, which, you know, triggers other things. So why is it turning on whether he asked for other protections? I mean, once it's assuming it morphed from civil to criminal, why doesn't the nature of the proceeding being criminal trigger the concerns and protections that we ordinarily give in a criminal context? I mean, you know, the waiver thing in the civil area is one thing, but, you know, unless there's an argument about whether it's criminal or not, it's penal, and ordinarily if it's penal, that triggers safeguards by the very nature. I mean, I sort of hear you saying no objection is waived and da-da-da-da, but maybe that's not what you're saying, so clarify for me. Yes, Your Honor, and I would just like to start with the general rule, and that is that any legal right, even a constitutional one, is generally forfeited by failing to assert it in the district court. The plain error rule actually, I mean, it comes from criminal procedures in which a criminal defendant has failed to object to something that he alleges that he was entitled to. Well, Mr. Drabble, maybe it's point two or three, but from Mr. Street's viewpoint, as argued in the brief, the problem with that is, Len, you said don't worry about it, there's no criminal in this courtroom today, we're going to deal with civil matters, and when would you say on this record it would have been clear to Demetric Counsel that there were going to be criminal sanctions, potentially, you may not accept that this was criminal. When did that occur in light of what Judge Hughes said earlier in the proceeding? Well, that's what I, we have to go back before the proceeding when Robago filed its motion. It was at that point that Robago requested civil and criminal sanctions. So, Demetric's counsel should have objected when Judge Hughes set the motion for hearing and said that because Robago is seeking criminal sanctions, Judge Hughes couldn't set it for a hearing. He had to open a separate criminal proceeding, appoint a prosecutor, and hold a jury trial. And I would note that Demetric knew that the criminal sanctions were on the table. After Judge Hughes set this motion for hearing, he filed two other motions, Demetric filed two other motions, both of which acknowledge that Robago was seeking both criminal and civil sanctions. Now, the hearing actually consists of two parts, beginning with the deposition of Mr. Lacayo, followed by the contempt proceeding itself. Before Lacayo's deposition, Demetric had retained a new counsel who was there for the express purpose, and he said he was there because contempt can be a hybrid civil slash criminal. That was not a question, as Demetric says in his brief, that was a statement. He recognized the sanctions were on the table, and what he should have recognized is that there was no jury in the box, there was no prosecutor sitting at the other table, and no separate criminal proceeding had been opened. He should have objected before Mr. Lacayo's deposition. And finally, the last opportunity would have been after the judge actually made his ruling and imposed the remedies in this case, in which Demetric's counsel should have said, you know, at the beginning of this hearing, you said it was going to be a civil enforcement hearing, but we believe that by imposing a $50,000 reward, setting forth a record-keeping requirement, and extending the injunction, you cross the line from civil and criminal, and we object. And she didn't do that either. In fact, Judge Hughes expressly elicited comments from Demetric's counsel asking if she had anything to add, and she said nothing. So Demetric had an ample opportunity to object. And I'd like to contrast this case to what happened. But before you leave that, when was it first raised by Demetric that this was criminal and the wrong procedures were followed? My recollection is that it was not raised until there was a motion to stay filed after the appeal was filed in which they raised this argument. Motion to stay after what? I lost you. I'm sorry. Demetric filed a motion to stay the contempt order after they filed their notice of appeal. And that, to my recollection, is the first time that he mentioned this lack of criminal procedural protections. But I'd like to contrast the opportunity that Mr. Demetric had to object with what happened in Enright Gates, which is the Fourth Circuit case cited in our brief. In that case, a criminal defense attorney showed up at a hearing 15 minutes late, and the court imposed a fine of $200. That attorney had no notice that there were any sanctions on the table, much less criminal ones. And yet the Fourth Circuit said that because he failed to object, the court had to apply the plain error doctrine. This court has also applied the plain error doctrine in a contempt case. It was an unpublished decision, but it's Viator v. Miller, which is also cited in the brief. And we think that the plain error doctrine should apply here and that Demetric cannot satisfy it. The plain error doctrine, of course, has four prongs. There must be an error, it must be plain, and the error must have affected Demetric's substantial rights. And then even if Demetric can satisfy those three prongs, there is still a discretionary prong in which the court should usually decline to recognize or correct any error. So I'd like to address the first two prongs together, that the error was plain, that there be an error and that it was plain. And that requires the error to be clear, obvious, or not subject to a reasonable dispute. And Demetric cannot meet that standard. The only issue at this point is the $50,000 reward to Ibaka, and Demetric has characterized that as a fine, but the district court never did. The district court said that he was awarding Ibaka $50,000, and that differs this case from most fine cases because it was not ordered payable to the court itself or to the government. It was ordered payable to another party. You couple that fact with the fact that Judge Hughes stated that this was intended to be a civil proceeding, and that indicates that this was intended to be a compensatory reward and not a fine. Those factors... When was the $50,000 payment first mentioned by Judge Hughes? Was it... Was the actual order that's in the record days, weeks later, or did he say that at the hearing when it concluded? When did that first get announced? He first announced it immediately after he made his ruling at the hearing. After what? After he made his ruling at the hearing, Your Honor. So in the courtroom itself, after the hearing, he said $50,000? Yes, Your Honor. He said the remedy is going to be award Ibaka $50,000, plus its attorney's fees, and then went on to describe the injunction extension in the record-keeping environment. Well, did your client put on any evidence as to damages, as to how this possible violation had harmed him? There was no, Your Honor, but that does not change the character of the award. The mere fact that the award may not be supported by the evidence does not change the fact that it was intended to be compensatory. The award wasn't supported by the evidence, and there's another remedy for that, but that's not this case because it's a civil award and therefore cannot be subject to an interlocutory appeal. And I would, going back, the fact that the court awarded it to Ibaka when coupled with his statement that it was intended to be civil are the exact same factors this court relied on in Enright Bradley to find that an award was civil, and also in Lewis versus the SS Vaughn, which is cited in Bradley. In both of those cases, the court said, the district court characterized this award as civil, and it awarded it to the complaining party, therefore we are going to find it as civil as well. So Demetri cannot show a plain error with regard to that. Even if this award was not considered compensatory, he still can't show a plain error because it's not clear that he was entitled to the full panoply of criminal procedural protections. And everybody agrees that the controlling case on this is Bagwell, and in that case, the Supreme Court stated that, for discrete categories of indirect contempts, civil procedural protections may be insufficient. Specifically, contempts involving out-of-court disobedience to complex injunctions often require elaborate and reliable fact-finding. And that was certainly the case in Bagwell. We had a complex injunction that imposed a code of conduct on a striking minor's union. There were ongoing and widespread violations of that injunction that occurred over most of the state of Virginia. And the state court in that case imposed a massive fine of over $52 million. And the Supreme Court said under those circumstances, the minor's union was entitled to the full criminal trial. But the court also stated that certain indirect contempts involving discrete, readily ascertainable acts, such as turning over a key or paying judgment may be adjudicated through civil proceedings since the need for impartial fact-finding is less. So what Bagwell envisions is a sliding scale in which the criminal procedural protections increase along with the complexity of the injunction, the need for elaborate fact-finding, and the amount of the fine. And because there's a sliding scale, Mitra can't show exactly where on that scale he follows. We think that he's closer to the discrete, readily ascertainable acts, than Bagwell. We have a relatively simple injunction containing six prohibitions, and the evidence related entirely to what happened one night in a restaurant in Mexico City. The hearing was conducted in less than a day. This did require elaborate fact-finding. This is day-to-day stuff in this report. So Dmitry cannot show a plain error. The third prong of the plain error standard is whether Dmitry can show that it's violated his substantial rights. He has the burden of showing that he has them. He's different. In his reply brief, for the first time, he makes the argument that these were structural errors. But the Supreme Court has repeatedly refused to hold that structural errors automatically qualify as satisfied third prong of the plain error test. They did that in Johnson, in Olano, and Puckett. So he hasn't shown that it affected his substantial rights. But even if he had, then this court gets to the discretionary factor. And the Supreme Court has instructed that the court should ordinarily disregard forfeited errors unless there is a miscarriage of justice. And that is an error that affects the fairness, integrity, and reputation of the judicial proceedings. And there are five reasons why there was no miscarriage of justice in this case. First, Dmitry had ample notice of the charges against him. As I mentioned before, Rubago in its motion expressly requested both civil and criminal sanctions. And it outlined the conduct by which Dmitry had allegedly violated the injunction. Second, Dmitry had an adequate opportunity to prepare his defense. Over six months passed between the filing of Rubago's motion and the actual hearing on it. The motion was fully briefed. And Dmitry had over one month advance notice of the hearing. He actually requested a continuance of the hearing in order to secure witnesses in his favor, which the district court granted him. Third, Dmitry had counsel of his choosing. He was represented by three lawyers of the contempt proceeding, including one who had been specifically retained because contempt can be a hybrid civil slash criminal. He had adequate protection there. He also had an impartial adjudicator. There was nothing in the record to indicate that Judge Youth was biased or prejudiced against Dmitry. And in fact, he was one step removed from typical contempt proceedings because he's not judging a violation of his own order. He's judging a violation of Judge Thompson's order. And finally, this isn't an excessive fine at all. Dmitry has never argued that it's burdensome or beyond his ability to pay. In fact, the record reflects that he did not pay it at all. It was paid by Denmark. And it's been in line with other sanctions that this court has imposed for bad conduct. So in the long run, an impartial observer who came into the court and he would not see a miscarriage of justice. He wouldn't see the district court run amok or anything fundamentally unfair. And for that reason, this court should decline to review any error that exists and just decline to exercise its discretion under the plain error test. I would like to briefly return to the proper interpretation of the injunction and picking up on what Judge Southwick commented, that Dmitry's interpretation is not a reasonable one because it is over-inclusive and under-inclusive. It is over-inclusive in that under his interpretation, it would prohibit any communications at all between him and a Robago employee that he started. So if Dmitry goes to the Robago corporate representative deposition and says hello to the designee, that's a violation of the injunction under his own interpretation. And on the other hand, it's radically under-inclusive because it doesn't accomplish what the injunction was designed to do. If Robago, if the Robago employee in question begins any communications with Dmitry, whether it's a complaint about a politician, local sports team's performance, comment, how's the weather, or just a simple hello, Dmitry was then allowed to solicit them for Benmar. And that's just not a reasonable reading of the injunction. The only reasonable reading is that Dmitry is precluded from taking the initial step, communicate with Robago employees about working for Benmar. That's the key thing, is who broached the subject about working for Benmar first? Was it Dmitry or was it the Robago employee? And the district court's finding that it was Dmitry is not clearly erroneous. This was a straightforward credibility determination. The district court had in front of it two versions of what happened. Mr. Lacayo testified that Dmitry solicited him in the restaurant, saying how much, where do you want to work, what do you want to do, how much do you want to make? Dmitry and the other Benmar employees had a different version in which they stated that Dmitry not only did not solicit Lacayo, he said he couldn't solicit Lacayo. And resolving that credibility determination is purely the province of the district court. Mr. Diaz. Credibility, the answer to the Diaz piece of this also? That is part of it, Your Honor. Diaz did testify that he offered to accept any communications for Lacayo as a courtesy about working for Benmar. The district court could have disbelieved Diaz's testimony. A testimony does not need to be contradicted to establish it. And the second part of that is that while Mr. Lacayo could not remember the exact details of his conversations with Diaz, he did contradict other aspects of Diaz's testimony. Specifically, Diaz testified that Mr. Lacayo loitered around Benmar's booth at the trade show for so long that Diaz noticed. He said it was strange and odd because it's not like they have, it's not a normal trade show where you have your wares on the table and someone can just go up and, you know, look around. Lacayo testified that he didn't do that. In fact, he didn't talk to Diaz at the booth and it was at another area of the trade show. So contrary to what Dmitry has argued, Diaz's testimony was not entirely incontradictory. There were two competing versions and two stories and the district court's decision to credit Mr. Lacayo's is not clearly around this. What is in the record to make it clear in what order these contacts were made? Did the contact with Diaz happen and only later the contact with Dmitry? How do we know the order in which they happened? What went first? We, they tested, although the party's testimony was not clear with specific times, but everyone seems to agree that Mr. Diaz and Mr. Lacayo ran into each other at the trade show. I'm not sure that there was a, there was any testimony about whether that happened before he bumped into Dmitry at the trade show. There were two contacts at the trade show and I'm not sure that either party testified which happened first. But the solicitation that, and the communications about working for Venmar did not occur until later in the evening in which Mr. Dmitry and Mr. Lacayo went to the restaurant next to the city. It was after 830. Thank you, Your Honor. All right. Thank you, Mr. Drabble. We're back to you, Mr. Street, for a rebuttal. Mr. Street, I want to ask something of you. You didn't get into this civil versus criminal distinction. And I have to say I'm not exactly, I don't exactly understand the significance of it here. Can you talk a little about that? You're muted, Aaron. I'm not. Can you hear me now? Yes. Yeah, we can hear you now. Sorry about that. Did you hear my question? I did, Your Honor. I think it's important at the outset of the answer to that question to point out that all of Mr. Drabble's comments about waiver and plain error don't have anything to do with the proper interpretation of the agreement and whether Mr. Demetric violated the preliminary injunction in the first place. They all go to Your Honor's question about civil versus criminal contempt. Now, let me first, I guess, turn to the waiver issue and then turn to what is the significance of the civil versus criminal contempt. And just to be clear about what's still at issue in the case, because there was some reference to that, there were four sanctions imposed. There were attorney's fees. There was a $50,000 flat non-purgable fine. There was a record-keeping requirement. And there was an extension of the injunction for three months. Now, the injunction extension has expired, although Judge Hughes let it extend for seven months because he refused to set an end date on the preliminary injunction. The record-keeping requirement itself has expired, but Judge Hughes has kept his records. Initially, he ordered them to be turned over to Rivago, and then he revised that to turn them over in camera for Judge Hughes's review. So our challenge to the record-keeping requirement is still very much alive because if this court holds that was an improper sanction, then it would have been improper to keep them in the first place, and Judge Hughes certainly can't turn them over or review them. Of course, the challenge to the $50,000 fine is still alive as well. Now, to be quite honest with the court, we're not here primarily about a $50,000 fine and a mostly expired record-keeping obligation. We are here because this contempt order has an ongoing stigma on Mr. Dmitrich, and it can be used in the marketplace by Rivago, and that's why we're really asking the court to particularly focus on properly construing the agreement and taking the preliminary injunction and taking account of the undisputed facts that show that Mr. Dmitrich did not violate the preliminary injunction. But let me briefly address the civil versus criminal question. First of all, Mr. Dmitrich did not waive this issue. At the very beginning of the hearing, Judge Hughes says, there was a remark by Dmitrich's counsel earlier. Something about this is a hearing about the injunction. There could be criminal mixed up. There will be no criminal at this proceeding. And then Judge Hughes says, this is a civil enforcement or inspirational hearing. It will all be quite civil. Well, is Judge Hughes like the Pope? I mean, does he speak ex cathedra? Is that? Not at all. Well, when he declares, okay, this is civil or this is criminal, either way, I mean, does that make it true? He said it's civil. He said it is civil. And I only referenced that to show that this issue of whether this was civil or criminal and whether the proper procedures were in place was squarely before Judge Hughes. It was not waived. He considered it. But absolutely not, in answer to your question, Your Honor, Judge Hughes calling this a civil hearing does not make it a civil hearing. What makes it civil versus criminal is the nature of the sanctions that are imposed. That's what the Supreme Court said in Bagwell. To be honest, that's all this court needs to read to decide this question. Bagwell says that a flat, non-credible fine is the quintessential criminal sanction. It wasn't tailored to any evidence in the record of damages, as my opponent conceded. And Judge Hughes never explained how the $50,000 fine related to any compensatory purpose. So it's your position, then, I take it, that this is a criminal sanction. Absolutely. And, therefore, it could only be imposed after criminal procedural protections were in place. We raised that at the hearing. We raised that in a motion to stay, filed right after the contempt was in place. We argued that these were criminal sanctions imposed without the proper procedures. Judge Hughes at that time could have corrected his error and held a proper hearing. But I'd like to briefly turn back, if I could, for just a moment, to the question of the interpretation. And I think Judge Southwick asked, well, what is the evidence on the order of contacts? The evidence was that Mr. Diaz and Mr. Dimitric had their conversation about Venmar employment first. Because Mr. Dimitri, I may have misspoken, Diaz and Lacayo had their conversation first. Because Mr. Lacayo said, oh, I know Kirk Dimitric. And then later he ends up running into Dimitric, according to his testimony. So my key point here, to wrap up, is that even under Ravago's interpretation of paragraph four, even under the suggestion from Judge Southwick's question, that it has to be an initial contact to solicit employment. The initial contact to discuss employment here was the discussion between Diaz and Lacayo. That was unrebutted and material part. Judge Hughes made no credibility finding on that, although he did about a couple other witnesses. And so the plaintiff can't carry its burden by clear and convincing evidence to show contempt. Let me stop you on that, because you're on the light. But to go back to the criminal, because I asked this of counsel opposite on this criminal, I'm glad Judge King brought it back up. Because now, as to drabble his argument, I said, okay, if this criminal is criminal, doesn't that trigger certain concerns? He says, well, King's ex, plain error. He says plain error arises in a criminal context. And he walked us through the four factors, the prongs on plain error, et cetera, et cetera. So not giving you additional argument time, but on the criminal matter that's been revisited here to Judge King's upstanding, you're saying it's criminal. His argument is, so what? He doesn't say it that way, but he says it's still subject to plain error. One, two, three, four. So simply put, give us just a straight narrative, your response on the plain error. He says one point you bring up for the first time in the reply, but just so we can be clear, what's your position on the okay, it's criminal, but plain error, one, two, three, four. Our reply brief was our first opportunity to respond to the plain error assertion. That seemed pretty out of left field to us. But to give the short narrative answer here, plain error does not apply because we put this issue before Judge Hughes at the hearing. We said, is this going to be a civil hearing or a criminal hearing? He said it's going to be a civil hearing. So we could take his word for that. We don't have to say, oh, Judge Hughes, it's a civil hearing. Please give us a trial by jury. He would have laughed us out of the courtroom. It only became clear that it was a criminal hearing when the sanctions were imposed at the end of that hearing. At that point we had a fully appealable order because we had an appeal of those contempt sanctions. But we went even beyond that and we raised the criminal sanctions in a way that would impose criminal sanctions on us without giving us the proper procedures. So Judge Hughes was amply on notice of this issue. He just mistakenly believed that it was a civil proceeding, just as he mistakenly believed that this paragraph four covered all discussions of employment with Rivaga. Now, my final point on the civil versus criminal, because I'm sensing the court doesn't want me to go back to the interpretation issue. Right. You're right. I don't. Just stay with the criminal. And my very last point is Judge Stewart. I think your intuition is precisely correct that once this became a criminal hearing, it required certain protections as a matter of structural error. That's what this court held in the American Airlines case where there was no objection below to the absence of criminal procedural protections. No objection at all. Here we have objections. That's what the fourth circuit held in the Buffington case. It said, once you've got an appealable order, you don't need to raise the criminal procedural protections again, because that's a structural error. So that for that reason, the court should at a bare minimum vacate all the criminal sanctions. Of course, we ask that the contempt order be reversed in its entirety. All right. Thank you. That's helpful to clarify. Any additional questions by the panel? All right. All right. Thank you. Mr. Streetness travel for good briefing and good argument. You both on top of it. We appreciate it. The case will be submitted. We'll get side as soon as we can.